Mrs. Niels (Mellie) Esperson, Executrix, Estate of Niels Esperson, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 7377. Promulgated September 27, 1928.

*B. F. Louis, Esq.*, for the petitioner.
*Bruce A. Low, Esq.*, for the respondent.

598

600

LITTLETON : There are two questions in this case, one being a question of limitation and the other the *bona fides*, or, rather, whether an actual sale was made of certain securities.

Section 250 (d) of the Revenue Act of 1921, being a limitation statute, wherein the limitation periods, generally, are four or five years (as it applies to the several Acts) contains this proviso:

That in the case of income received during the lifetime of a decedent, all taxes due thereon shall be determined and assessed by the Commissioner within one year after written request therefor by the executor, administrator, or other fiduciary representing the estate of such decedent.

The contention of the petitioner on this point is that the letter from George V. Newton, dated January 7, 1924, constituted a claim on her part for the determination and assessment of any additional tax which might be shown due from the estate of Niels Esperson within one year from January 7, 1924, and that since the deficiency here in question was not made within such one-year period, the assessment and collection thereof are barred. First, assuming this letter to embody the requirements under the Act to start the statute running, was it made by an " executor, administrator, or other fiduciary representing the estate of such decedent?" Secondly, did this letter constitute a request within the meaning of the statute?

Conceding, for the purpose of discussion, that this was a request, by whom was it made? Admittedly, it was not made by the petitioner, executrix of decedent's estate, or other person acting in a similar capacity. The petitioner, however, contends that Newton, who made

such request, was her agent authorized to represent her before the Department in matters affecting the income-tax liability of the estate of the decedent and that, therefore, this must be considered as a request by her or on her behalf. The difficulty in determining the authority granted to Newton or, in truth, whether Newton had any authority to represent the petitioner in any capacity on January 7, 1924, lies in the fact that whatever power of attorney was given to Newton (if any had been given) was not submitted in evidence, nor was convincing evidence presented that any authority had been granted to him on January 7, 1924. When Newton was asked on direct examination whether he ever had a power of attorney, his reply was, " I can not recall." The petitioner, who was called as a witness, did not state that she ever gave Newton power of attorney to represent her, but merely stated, in reply to leading questions, that, prior to 1924, she was aware that Newton was acting as her representative before the Department with respect to the estate in question and that she acquiesced in, and consented to, such action.

The manner in which Newton came into the case appeared to be somewhat as follows: Mattison & Black, accountants in New York City, had been employed by the petitioner to represent her in various income-tax matters, including the estate in question, though when this employment began, does not appear. The extent of the authority granted to Mattison & Black likewise does not appear, other than that some kind of a power of attorney was given Mattison to appear in her behalf before the Department, though the respondent rejected this power of attorney as not satisfying his requirements with respect to such powers of attorney from an executrix. Newton had an office in the suite occupied by Mattison & Black and on various occasions had been associated with these accountants in tax cases. Among the cases which Newton handled under authority received from these accountants was that of Niels Esperson for a year prior to those here involved. Apparently, prior to 1924, though the record is far from clear on this point, Newton was in Houston, Tex., at the suggestion of Mr. Mattison, in connection with various tax matters and at this time was introduced to the petitioner by Mattison. Newton's testimony as to what transpired at this time is as follows:

Q. State if anything was said in your conversations or conferences there with reference to whether or not you were to handle all income matters for the Estate of Niels Esperson, deceased, and Mrs. Esperson individually.

A. Well, I had just cleaned up a case for Mr. Esperson and we discussed that, as I recall, and the revenue agent was down. That is when he made his first investigation and we discussed the handling of this case, together with the handling of the Estate tax of Mr. Esperson. *I think that Mr. Mattison in the conversation stated that I would probably handle the matter before the Department.*

Q. Was there any expression from Mrs. Esperson as to that being satisfactory or unsatisfactory?

A. *I can't recall that.* I know there was no objection; I would be positive of that. (Italics supplied.)

Whether Mattison & Black were authorized to represent the petitioner at this time or on January 7, 1924, when the letter on which petitioner relies was written, does not appear. In addition we have facts showing that on various occasions subsequent to January 7, 1924, Newton appeared before Bureau officials in behalf of the petitioner, and his authority to so represent her was not questioned, though it does not appear that the question was ever raised. Also, we have the fact that Newton was furnished with copies of letters by the respondent in regard to petitioner's case, and otherwise recognized in correspondence as a representative of the petitioner.

Our question now is whether the foregoing facts, together with such other facts as appear of record, establish that the request in question was made by a person *representing* the estate of the decedent. In this connection it should be observed that we are here concerned with a statute of limitations with respect to the period within which taxes may be assessed and collected. Such statutes must be strictly construed. As we said in *Joy Floral Co.*, 7 B. T. A. 800, "It is well settled law that no period of limitations will bar a claim of the Government unless the limitation is expressly authorized and the claim falls within it." When the facts in this case are so considered, we fail to find justification for saying that the evidence establishes that Newton was acting under any authority when he wrote the letter in question. The evidence establishes little more than that Newton appeared before the Department in behalf of the petitioner when the tax matters here in question were in controversy, and that during a part of the time, at least, the petitioner was aware of these activities on the part of Newton. And by implication we are asked to say that therefore Newton was an authorized representative of the petitioner on January 7, 1924, and that he was acting within the scope of such authority when he wrote the letter in question. This we can not do. In fact, it is not clearly established that Mattison & Black, through whom the case apparently came to Newton, were authorized representatives on January 7, 1924, or that the petitioner was aware at this time of Newton's activities. As to the failure of the Bureau officials to question Newton's authority to appear for the petitioner and their action in recognizing him as her official representative, we feel that little aid in answering our question is derived therefrom. The record shows that the question was never raised, and therefore it can not well be said that it was ever shown that the requisite authority existed. In view of the foregoing, the Board is of the opinion that it has not

been established that the request in question was made either by the necessary parties mentioned in the statute or one shown to have authority to act in their behalf.

But even if we should hold that a person other than an " executor, administrator or other fiduciary " could act in the manner contended for, we are not satisfied that the letter constitutes a request which would start the running of the statute. Again, a strict construction is necessary and, consequently, it must be clearly shown that a specific request was made within its terms.

It is to be noted that the letter in question contains no reference to the section of the statute in question, nor shows on its face that it purported to claim the benefit of this special statute of limitations. The reason assigned for the request was that the estate tax of the decedent could not be determined until the income tax of the decedent for the years prior to his death was determined. Apparently, Newton was at this time interested in some manner in securing an adjustment of the estate tax of the decedent. To determine the amount of estate tax due, it is, of course, necessary to arrive at the net value of the estate at decedent's death, including in such determination all liabilities, of which liability for income tax would be one. The logical inference which we are of the opinion should be drawn from this letter is that the income tax determination was only incidental and that the real purpose in writing the letter was to secure a final determination of the estate-tax liability. In fact, the same kind of a letter could well have been written by a representative who was interested only in the settlement of the estate-tax liability and had no interest, connection or authority with respect to the income-tax liability other than that a final determination of the latter was necessary before the former could be arrived at.

Subsequent events tend to confirm the conclusion that the letter of January 7, 1924 was not intended as a request of the character contended for. The record indicates that the revenue agent's examination requested in this letter was submitted on July 1, 1924. Whether any action was taken between this date and February 16, 1925, we do not know, but on this last-named date Newton wrote another letter similar in character to the one of January 7, 1924. The only material difference between the two letters is that in the first letter Newton was asking for an audit of certain returns which had not yet been examined by a revenue agent, whereas in the second letter he was asking for an audit of the revenue agent's report which had been submitted for the years referred to in the prior communication. Essentially the same reason was given for the request as in the prior communication, namely, the necessity for determining the income tax due before the estate tax could be adjusted. In neither case was any mention made of the section of the statute

of which the petitioner now claims the benefit, nor suggestion offered from which it could be implied that they purported to start running this special statute of limitations. Newton testified that when he wrote the letter of January 7, 1924, he had in mind the provision in question and that he knew this to be true because he had had two letters from Mattison & Black asking him to make the statutory request. If such a motive prompted the writing of this letter, we deem it unusual that the request would have been made without any reference to such fact. But, be that as it may, what he may have had in mind is not of paramount importance here; what we are interested in is a specific request under a special statute. The petitioner contends that, since the reply from the respondent states that the case would be given consideration under the provision in question, this would serve to cure any defect in the request itself and to show that it was a request of the nature contended for. As to this, we are of the opinion that unless the request was proper in the first instance, it could not be made so by this later statement from the Commissioner. But if this first letter was intended as a " written request " which would start this special statute running, it is difficult to conceive of why another letter practically identical in character and giving the same reasons for the request should have been written after the one year which the petitioner claims the benefit of in the first letter had expired. The explanation offered by Newton with respect to the second letter is not sufficient to convince us that both letters were not mere requests to have the income-tax cases expedited as a means to securing an adjustment of the estate-tax cases. In fact, Newton's explanation of the purpose of the second letter is substantially what we have indicated with respect to the first letter. Certainly, it is difficult to read the two letters and interpret the first one as embodying a specific request on as important consideration as would start the running of the statute of limitations and the second one as a mere request to expedite the audit of certain income-tax returns as a means of closing an estate-tax case. It is further significant that except in the conference held on April 23, 1925, as to which Newton testified that he then stated that he was relying on the statute in question, the evidence fails to show that the provision was ever referred to in correspondence by the petitioner or her representative, or othewise specifically brought to the respondent's attention. Once a proper request had been made, this would, of course, have been sufficient, but the absence of any reference throughout the case, except at a conference after the statute had run, argues strongly for the position that the letter of January 7, 1924, was not intended originally for the purpose now contended for.

In view of the foregoing considerations, the Board is of the opinion that the specific request required by the statute was not made in the letter of January 7, 1924, and, accordingly, that the deficiency here in question is not barred because of a failure of the Commissioner to make such determination and assessment within one year from this date.

The next question is whether in October, 1921, Niels Esperson made a *bona fide* sale of 8,100 shares of Invincible Oil Corporation stock. Petitioner claims that there was an actual sale made of this stock on the New York Stock Exchange, though admitting that the sale was made at that time for the purpose of securing the benefit of a loss as a deduction from gross income for tax purposes on account of this stock, which had greatly declined in market value. The respondent denied the deduction claimed on the ground that the transaction in question did not constitute a *bona fide* sale.

The transaction in question occurred prior to the passage of the Revenue Act of 1921, and, accordingly, the provision in that Act (section 214 (a) (5)) which prohibits the taking of a deduction on account of a loss on the sale of securities where, within 30 days of such sale, a taxpayer has repurchased substantially identical property, would not be controlling. Prior to the enactment of the 1921 Act there was no similar statutory provision. We have also held that the mere fact that the sale was made for the avowed purpose of taking a loss and that shortly thereafter there was a repurchase of the same or similar securities does not preclude the taking of the loss under the revenue acts prior to the Revenue Act of 1921, provided there was, in fact, an actual *bona fide* sale. *The Pennsylvania Co. for Insurance on Lives and Granting Annuities, Executor*, 2 B. T. A. 48; *Benjamin T. Britt*, 2 B. T. A. 53.

This issue then resolves itself into the one question of whether there was, in fact, a *bona fide* sale. Since the transaction was made for the avowed purpose of reducing taxation and apparently would not have been consummated otherwise at this time, every requirement of a sale must be met. As we said in *I. Stewart & Co.*, 2 B. T. A. 737:

* * * It can not be too much emphasized that alleged sales of property for the purpose of establishing losses must be real, valid transactions, definitely placing the legal and equitable ownership of the property alleged to have been sold out of the hands and out of the control of the seller.

In other words, we do not have the situation where doubts are to be resolved in favor of the petitioner, but against her.

What happened may be summarized as follows: In October, 1921, Niels Esperson had 8,100 shares of oil stock which had greatly depreciated in value, but he apparently knew that the depreciation in the value of the stock could not legally be taken as a deduction from gross income without a disposition of the stock. He also apparently de-

sired to retain the stock. Confronted with this dilemma, Esperson. consulted with one Signor, stockbroker and close friend for about 25 years, as to how the end he had in view could best be accomplished. As a result of the discussion, Esperson instructed Signor to sell the 8,100 shares and to purchase the same number of shares, such purchase to be ostensibly for Gust H. Peters and Charles W. Brown. Peters was Esperson's secretary and Brown his brother-in-law. Neither had any financial standing with the broker, and apparently knew little about the transaction prior to its consummation other than that Esperson had told them that the stock was being purchased in their names and that he would loan them the money with which to pay for it. Signor gave the "sell" and "buy" orders to nine different brokers, the number of shares assigned to each ranging in amounts from 500 to 1,600 shares. The alleged sales and purchases were made in blocks of 100 to 900 shares, and in all, 27 alleged sales and purchases were made. For each sale there was a corresponding purchase on the same day, by the same broker for the same number of shares and at the same unit price. During the four days when the transactions were occurring 40,100 shares of this stock were traded in at a price range from $10\frac{3}{4}$ to $11\frac{7}{8}$ on the first day, $10\frac{3}{4}$ to $11\frac{3}{4}$ on the second, $10\frac{3}{4}$ to $11\frac{1}{4}$ on the third and $10\frac{3}{4}$ to 11 on the fourth day. Esperson delivered his stock certificates to the broker on October 25, and on November 9, following, the same number of certificates were received by the broker from seven of his correspondents. The broker then forwarded these certificates, last received, to Peters and Brown. Prior to this time, the broker had sent a check to Esperson for the total amount of the alleged sales and bills to Peters and Brown for the amount due on account of the alleged purchases. The amount ostensibly due from Peters and Brown was paid by checks issued by Esperson to them, and then indorsed by these individuals and forwarded to the broker. The stock certificates, immediately upon receipt by Peters and Brown, or shortly thereafter, were indorsed by them and turned over to Esperson as collateral for the alleged loan to them. No note was given for the loan, nor was interest charged thereon. In December, 1921, at the instructions of Esperson, Peters made entries on Esperson's books, charging Peters and Brown with the amount of the so-called loans. These accounts remained on Esperson's books until 1923, after Esperson's death, when the charges against these individuals were canceled.

In a consideration of whether there was, in fact, a *bona fide* sale, we deem an extended discussion unnecessary with respect to the part played by Peters and Brown. Viewed from any angle, it is apparent that these individuals were not purchasing the stock, but were merely individuals who were willing to aid Esperson in the scheme by which the deduction sought could be obtained. In fact, we have already held in the estate-tax case of the petitioner, decided May 11, 1928,

that the stock was held by Niels Esperson as community property at the time of his death. What happened, therefore, in 1923, which petitioner contends amounted to a reacquisition of the stock, must be regarded as a nullity with respect to repurchasing the stock from Peters and Brown. We are likewise of the opinion that their part in the entire transaction must be disregarded, in so far as considering them as purchasers is concerned.

But was there an actual *bona fide* sale on the part of Esperson? As to what constitutes a valid sale, we said in *Harold B. Clark*, 2 B. T. A. 555:

* * * The payment of a price and the delivery of certificates do not constitute the sole requisite of a valid sale. The parties must make a *bona fide* transfer as persons dealing at arm's length would do—the seller for the purpose of absolutely getting rid of the stock and the buyer for the purpose of absolutely acquiring it as his own without any condition covering its later return to the seller. Receiving a credit for the price and the mere indicia of ownership, without the mutual element of intent on both sides to complete an absolute sale, can not constitute a basis for a deduction for loss under the provisions of the tax law. A loss to be deductible must be a reality.

We think the evidence in this case is not sufficient to justify the conclusion that the foregoing conditions have been met. A man can not make a sale to himself. And yet the evidence in this case would indicate that this transaction, which we are asked to accept as a sale, amounted to little, if anything, more than this. We have already eliminated Peters and Brown from the transaction as independent actors. Whatever, therefore, was done by them or in their names must be taken as if done by or on behalf of Esperson. The situation which we then have is that Signor, under Esperson's instructions, gave orders to other brokers to sell this stock for Esperson and likewise to buy the same amount of the same kind of stock for Esperson. Signor was familiar with the stringent rules of the New York Stock Exchange against fictitious sales, such as would arise in a purported sale and purchase by the same party. Hence the need for Peters and Brown to make the necessary appearance of a sale. The orders to " sell " and " buy " were given in different messages, but at the same time and to the same broker, but we doubt if the Stock Exchange would have permitted this had both the sales and purchases been made in Esperson's name. But when Peters and Brown are eliminated, isn't that the effect of what happened?

Further, we consider it, as expressed by one of petitioner's witnesses, unusual that *nine* different brokers should have been able to make twenty-seven different sales over a period of four days, at the same price at which they purchased the same number of shares of stock, in the same number of transactions at a time when there were five times the number of shares dealt in as were involved in these

transactions and when there was a substantial variation in the market price, unless the seller and purchaser were one and the same person. Signor testified that this would naturally be so, because he gave the orders at the same time. But should he not have added that it would have been extraordinary for the transactions to have occurred as they did in this case, unless the sale and purchase were one and the same transaction? That is, both orders could be executed by a sale of the stock to the person for whom he was ordered to buy at the same time and thus " naturally " the sale and purchase would be at the same price. In this case it would have been a sale for Esperson to Peters and Brown, who were in reality " dummies," in place of Esperson.

Some point was made by the petitioner of the fact that the stock certificates sold were not the same as those delivered to Peters and Brown. Of course, had they been the same, it would have strengthened our convictions as to the questionable nature of the entire transaction, but the mere fact that those received by Esperson through his " dummies " were different from those delivered to Signor, does not necessarily change its colorable character. Whether the delay in the delivery of the certificates to Peters and Brown till November 9, 1921, when Esperson had delivered his stock on October 25, 1921, neither of which constituted delivery within the three-day period specified in the rules of the New York Stock Exchange unless written contracts are exchanged on the following day (which is not claimed to have happened in this case), may be accounted for by a delay for the purpose of securing certificates other than those sold by Esperson, we do not know, but this delay certainly lessens the significance of the difference in the certificate numbers.

Other factors could be mentioned as a basis for concluding that the transactions in question did not constitute actual *bona fide* sales but we consider the foregoing sufficient. The action of the respondent in denying a loss on account of a sale is accordingly sustained.

Reviewed by the Board.

*Judgment will be entered for the respondent.*

GREEN dissents on the first point.

LOVE, dissenting: I can not agree with the decision or the opinion in this case.

While this is a fact case in that the decision depends on the finding, as existent or nonexistent, of certain facts, it is not a case calling for a " jury verdict " on the credibility of witnesses and the weight to be given their testimony. All the evidentiary facts are accepted as proven. The Board is called upon, after considering all those evidentiary facts to reach a conclusion as to the existence or nonexistence of ultimate facts which must determine the decision in the case.

On the issue of limitation the ultimate facts to be found to sustain the plea of limitation are:

(a) That George V. Newton was the authorized attorney of Mrs. Niels Esperson with authority to represent her in the Bureau of Internal Revenue in the income-tax matter of the Estate of Niels Esperson, deceased.

(b) That Newton, as the authorized attorney of Mrs. Esperson made a request of the Commissioner as contemplated and provided for in section 250 (d) of the Revenue Act of 1921. Counsel for the Commissioner did not contend that the request contemplated by said section 250 (d) could not be legally made by a duly authorized representative of the taxpayer. He did, however, challenge the validity of the authorization, largely on the ground that it was not proven that a written power of attorney ever existed. The prevailing opinion challenges the sufficiency of the request. The statute does not prescribe the form or the detail substance of the request that it provides for. All that is required is that a written request be made.

Newton, purporting to act as the duly authorized attorney for Mrs. Esperson, held a number of conferences with the duly authorized representatives of the Commissioner with reference to the Esperson tax cases. There is no evidence that his authority to so act was ever challenged in such conferences. He wrote the letter dated January 7, 1924, purporting to act as the attorney for Mrs. Esperson and it was accepted and acted on by the Commissioner as an authorized communication as is undeniably shown by the Commissioner's answer to that letter dated January 12, 1924. A written power of attorney is not necessary to confer such authority. The written document, if such exists, is only the evidence of such authority. That authority may be shown by other evidence. Mrs. Esperson at all times recognized Newton as her attorney, and accepted his services as such. The Commissioner, for at least two or three years, recognized Newton as Mrs. Esperson's attorney in the handling of these tax matters, and challenged such authority only after his determination of the deficiency.

May I ask the question what the decision would be if the letter in question were an agreement to extend the period of limitation. Even were the taxpayer a corporation, where the rule of evidence of authorization is held to be more stringent than with individuals, I believe any court would be amply justified in holding and would hold that authorization had been proven.

We come now to discuss the substance or purport of the letter dated January 7, 1924. In the prevailing opinion it is pointed out that in that letter, Newton made no mention of section 250 (d) and that the evidence is not convincing that he meant to invoke the provisions of that statute. The evident purpose of that statute was to force the closing of cases involving income tax due by estates of deceased

persons, and Newton, in that letter, assigned as his reasons for making the request those very grounds. The Commissioner was not misled, as his reply clearly shows. His reply dated January 12, 1924, promised that "the case will be given immediate consideration under the provisions of section 250 (d) Revenue Act of 1921." That letter of the Commissioner conclusively proves that he recognized Newton as being authorized to make the request, and recognized the letter as such request under the provisions of section 250 (d) of the Revenue Act of 1921.

The determination and assessment of the tax were not made within one year from date of Newton's letter, as provided for in section 250 (d) and as promised in the Commissioner's letter of January 12, 1924. By reason of that situation petitioner interposed her plea of limitation in bar, and I believe that plea should be sustained.

I will now discuss the case with reference to the alleged sale of the 8,100 shares of the Invincible Oil Corporation stock. The uncontroverted facts in the case, briefly summarized are:

1. In 1921 Niels Esperson was the owner of 8,100 shares of Invincible Oil Corporation stock, the market price of which had materially declined since its purchase by him.

2. By reason of that fact he was desirous of disposing of said stock in such a way as to entitle him to take a deduction on his income-tax return as a loss.

3. In order to effectuate his purpose, he placed the stock in the hands of his broker with instructions to sell the same; and at the same time gave instructions that the same number of shares be purchased for and in the name of two of his employees, Brown and Peters.

4. The brokers, in carrying out the instructions of Esperson, on October 17, 18, 19, 20, 21, and 26, 1921, sold said stocks in blocks on the New York Stock Exchange in accordance with the rules and procedure of that Exchange. On the same several days they purchased, in the name of Brown and Peters, an amount of stock equal to that sold on that day for Esperson.

5. On each of those several days there was sold on the New York Stock Exchange, Invincible Oil Corporation stock, several thousand shares in excess of number of shares of the Esperson stock sold.

6. The certificates for the purchased stock were made in the name of Brown and Peters respectively, billed and mailed to them.

7. Brokers' commissions were charged to and paid by Esperson on the sale, and like commissions on the purchases, were charged to, and paid by Brown and Peters, respectively.

8. Esperson furnished to Brown and Peters the money to pay for the stock so issued to them, which amounts were charged to Brown and Peters on Esperson's books.

9. Esperson died in 1922, and in 1923, Mrs. Esperson, the executrix and sole legatee of his estate, took over, or back, said stock from Brown and Peters and canceled the charges against them.

Upon the foregoing array of evidentiary facts, the Board is called upon to reach a conclusion of fact as to whether or not Esperson, in fact, sold his stock. The prevailing opinion reaches the conclusion that Brown and Peters were mere dummies in the transaction and that the ostensible sale to them was in fact a sale to Esperson himself, and that because Esperson was the seller, and also the buyer, and because one can not sell property to himself, there was, in fact no sale at all.

Esperson died before the hearing in this case and even before the controversy arose. In his income-tax return for 1921, he took a deduction for one-half the loss claimed by him to have been sustained in that transaction and his wife in her return took a deduction for the other one-half. By reason of his death, his testimony as to any contract or arrangement with Brown and Peters, if any, was not available. All we have in the way of evidence was necessarily from other sources and its substance is stated hereinbefore.

Waiving for the moment the question as to whether or not a person, when dealing through a broker on the New York Stock Exchange, can in law sell something and buy it in for himself, I may point out, as is pointed out in the prevailing opinion, that a pretended sale on that Exchange which is not in fact a sale is contrary to the rules of the Exchange. It is indicated in the prevailing opinion that the brokers knew that the seller and purchaser were one and the same person. I believe that is an unwarranted conclusion. An officer of any organization is presumed to comply with its rules and perform his duty relative thereto. All the evidence in this case harmonizes with the theory of a *bona fide* sale. Not one of the items of evidence is inconsistent with *bona fides*. It is true that the facts and circumstances may arouse suspicion of *mala fides*, but cases should not be decided on suspicion. It is said that one can not sell to himself. If, by that declaration, it is meant that one, without the intervention of an intermediary agency, can not sell to himself, I might be willing to accept the statement as good law. But where an intermediary agency intervenes, I can not accept the statement as good law. I dare say such transactions occur on stock exchange every day for various and sundry reasons. It often occurs in trustee sales where the one who owns the beneficial interest in the property has it sold by the trustee and bids it in. Less frequently, but sometimes, it occurs that, in order to clear title or for other reasons, the owner of the fee, the mortgagor, will let the property be sold by the trustee and bid in the same.

In the case at bar, it is conceded that at the date of the transaction in question Esperson had a perfect right to sell his stock and on the same, or any other day, buy an equal amount of the same kind of stock, and take his loss on the sale. In fact, I believe it is conceded that if in fact he sold to a stranger he could buy back the same stock on the same day it was sold. There is nothing in the record that proves in a legal way that the stock bought for Brown and Peters was the same sold on behalf of Esperson. There is nothing stronger to my mind than a suspicion that it was the same stock. Admitting for the sake of argument that it was the same stock, I can not perceive that any legal or equitable impediment exists that would preclude a holding that it made no difference. That there was a sale, at least in form and according to the rules of the Exchange, made on the part of Esperson of his stock, and a purchase on the part of Brown and Peters, can not be denied. Even if Esperson intended that Brown and Peters should hold the stock for him, nevertheless there was a sale, and the legal title passed to Brown and Peters, and only an equitable title remained in Esperson.

There is nothing in the record except some suspicious circumstances, that could have prevented Brown and Peters from forcing Esperson, prior to his death, or Mrs. Esperson after his death, to accept the amount of the purchase price plus interest, in the event they should have found it to their interest to pay it. There may, possibly, have been an agreement between Esperson and Brown and Peters which a court of equity would enforce, that would have prevented such a situation but there is no evidence in this record to support a finding to that effect.

I believe that the decision in this case on the merits of the case should be for the petitioner.

*B. F. Louis, Esq.*, for the petitioner.
*Bruce A. Low, Esq.*, for the respondent.